UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
LUZ TARAZONA,                              :
                                           :     **OPINION AND ORDER**
                         Plaintiff,        :
                                           :     16-cv-76 (PK)
              -against-                    :
                                           :
ROTANA CAFE & RESTAURANT INC., d/b/a       :
AFTER 8 CAFÉ LOUNGE and ATEF               :
ELAKHRAS,                                  :
                                           :
                         Defendants.       :
------------------------------------------------------------ x

**Peggy Kuo, United States Magistrate Judge:**

Plaintiff Luz Tarazona ("Plaintiff") brought this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207, 216(b), the New York Labor Law ("NYLL") §§ 650 *et seq.* and 12 N.Y.C.R.R. §§ 142-2.2, 142-2.4 against defendants Rotana Cafe & Restaurant Inc. d/b/a After 8 Café Lounge ("After 8") and Atef Elakhras ("Elakhras") for unpaid minimum and overtime wages, and unpaid spread of hours pay. Plaintiff also seeks statutory damages for Defendants' violations of annual wage notice requirements under the NYLL §§ 190 *et seq*. A bench trial was held on September 23, 2016. (*See* Dkt. 22.) This Opinion and Order constitutes the Court's findings of fact and conclusions of law.

## DISCUSSION

### I. Findings of Fact[1]

    A. *Fact-finding Under the FLSA and NYLL*

An FLSA plaintiff employee "has the burden of proving that he performed work for which he was not properly compensated." *Daniels v. 1710 Realty LLC*, No. 10-CV-22 (RER), 2011 WL

---

[1] To the extent to which there appear to be contradictions within the evidence introduced, these Findings of Fact also constitute the Court's credibility determinations.

3648245, at *4 (E.D.N.Y. Aug. 17, 2011) (quoting *Rivera v. Ndola Pharmacy Corp.,* 497 F. Supp. 2d 381, 388 (E.D.N.Y. 2007)). The employee may discharge this burden by obtaining the production of his employer's records, where such records are "proper and accurate." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds*. Where employer records are "inaccurate or inadequate," the employee must prove that "he has in fact performed work for which he was improperly compensated" and produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*

The employee "can rely solely on his or her own recollections to meet this initial burden." *Daniels*, 2011 WL 3648245, at *4 (internal citations omitted). Once the plaintiff has met his burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88. Courts may award damages approximating the loss to the employee where the employer does not provide such evidence. *Id.* at 688.

B. *Undisputed Facts*

After 8 opened in 2010 as a hookah café in the Astoria section of Queens, New York. (*See* Tr. at 53, 112; Joint Pre-Trial Order ("JPTO"), Dkt. 18 at VII.2.) It later obtained a liquor license and a cabaret license, and began operating as a restaurant with a full kitchen. (*See* Tr. at 26-27, 53-54, 56, 78, 144-45.) The parties stipulated that After 8 is an enterprise engaged in commerce, with annual gross receipts of not less than $500,000 at all relevant times, and is thus within the purview of the FLSA, 29 U.S.C. § 203(s). (*See* JPTO at VII.4.)

Atef Elakhras is the owner of After 8 and hired Plaintiff as a bartender. (Tr. at 18, 19, 36, 113.) Amal Lazhir ("Lazhir") is married to Elakhras. (Tr. at 52.) Her duties at After 8 involved managing the work schedules of employees and paying them. (*See* Tr. at 60, 68, 89-91, 127-28.) Plaintiff worked at After 8 until November 14, 2015.

### C. *Plaintiff's Evidence*

Plaintiff contends that she began work on June 6, 2014.[2] (*See* Tr. at 15, 17.) In support of this date, she introduced a screenshot of "Notes" that she purportedly put into her cell phone, which states, in Spanish, "I started working at After8 on June 6, 2014." (*See* Tr. at 15; Trial Ex. P-1 at Pltf's 0001.) In addition, she introduced photographs of her taken at After 8 on June 14, 2014; June 19, 2014; June 27, 2014; and July 19, 2014. (*See* Tr. at 29-31; Trial Ex. P-2, P-3, P-4, P-5.) She testified that on June 14, 2014, after she had already been working at After 8 for a few weeks, she and some relatives decided to watch Colombia's match in the World Cup on television at After 8 on her day off. (*See* Tr. at 47-48.) She testified that "Mustafa" was their waiter that day, and that an After 8 employee named "Ismael" took the photographs of Plaintiff. (*See* Tr. at 29-30, 48.)

Plaintiff testified that when Elakhras hired her, he told her she would be working as a bartender on Fridays and Saturdays "for now" and that he was waiting to get a cabaret license for After 8. (*See* Tr. at 19, 26.) When she started working, she worked on Fridays, Saturdays, and Mondays. (*See* Tr. at 23.) On Fridays and Saturdays, she worked from 4:00 p.m. until 4:00 a.m. as a bartender. (*See* Tr. at 23, 31.) These shifts never changed. (*See* Tr. at 31.) On Mondays, she worked as both a waitress and bartender, starting at 4:00 p.m., and would typically be done around 2:00 a.m. or 2:30 a.m. "if it wasn't too busy." (*See* Tr. at 23, 24.) About six or seven months after she started working, in approximately January 2015, After 8 obtained a cabaret license and began to present live music. Thereafter, Defendants' business "started doing much better" (*see* Tr. at 26-27), and Plaintiff picked up a fourth shift on Tuesdays, which was similar to her shift on Mondays, *i.e.*, she would start at 4:00 p.m. and work until approximately 2:00 a.m., as both a waitress and bartender. (*See* Tr. at 28, 31-32.) Plaintiff testified that she took breaks of "half an hour" or "45 minutes." (Tr. at 34.)

---

[2] She testified that she also was at After 8 for unpaid and non-tipped training for three days on June 3-5, 2014. (*See* Tr. at 20.)

3

Plaintiff received only a share of the tips, but no "house pay." (Tr. at 19.) When she interviewed with Elakhras for the bartender position, he told her that "the house did not pay anything." (Tr. at 19.) Plaintiff understood that she would be working only for tips, and accepted this arrangement because she "wanted to work." (Tr. at 19.) At no point did anyone at After 8 ask Plaintiff to present any identification, or even ask Plaintiff what her last name was. (*See* Tr. at 35.) When she started working, Plaintiff was trained by two co-workers—waiters identified only as "Danny" and "Mustafa" (Tr. at 24)—who told her they also were not getting paid "house pay." (Tr. at 24-25.)

Tips collected at After 8 were pooled. (*See* Tr. at 32.) At the end of each shift, Plaintiff and the waiters would count the total tips, give a percentage of the tips to the busboy, and split the remainder of the tips in equal shares. (*See* Tr. at 32.) Before After 8 obtained the cabaret license, Plaintiff would receive approximately $300 per week in tips. (*See* Tr. at 32.) After the cabaret license was obtained, After 8 was busier and she did "much better" in terms of her weekly tips. (*See* Tr. at 33.)

Although Plaintiff saw Lazhir at After 8 periodically, they never had any conversations about her work hours or compensation. (*See* Tr. at 23-24.)

With regard to the physical layout of the premises, Plaintiff testified that while she was employed there, the stage was moved, but she did not observe any changes in the design or size of the space, or the number of tables. (*See* Tr. at 45.) She stated that she "never saw construction workers." (Tr. at 45.)

D. *Defendants' Evidence*

Defendants contend that Plaintiff's employment at After 8 did not begin until late May 2015.

Elakhras testified that he hired Plaintiff in anticipation of a "grand opening" of After 8, following the completion of a substantial expansion of the space. (*See* Tr. at 121-22.) That

4

expansion began in December 2013, when he signed a lease for the adjacent retail space next to his. (*See* Tr. at 113-14.) Until then, After 8 only had room for a few tables. (*See* Tr. at 54-57, 112.) At trial, Defendant introduced several permits and certificates related to the expansion: a general Work Permit from the New York City Department of Buildings ("DOB") issued on January 22, 2014 and expiring on August 30, 2014; a DOB Work Permit for plumbing work issued on January 27, 2014 and expiring on January 27, 2015; a Certificate of Occupancy issued on January 13, 2015; and a Place of Assembly Certificate of Operation also issued on January 13, 2015, covering space that could accommodate up to 188 persons, classifying it as an "Eating or Drinking Establishment - Not a cabaret." (*See* Tr. at 115; Trial Ex. D-a.)

According to Elakhras, Defendants' contractor took down the wall separating the two retail spaces in April 2015. (*See* Tr. at 118-19.) During this time, in April-May 2015, After 8 was closed for a month for safety reasons. (*See* Tr. 118-19.) The employee schedule for the week of April 13, 2015 includes a handwritten notation, "After 8 will close from 4/20/2015 until 05/18/2015." (Trial Ex. D-d.)

Lazhir testified that the wall was removed in January 2015 and that the construction was completed in February 2015. (*See* Tr. at 56, 57.) However, when shown the notation about the premises being closed from April 20, 2015 to May 18, 2015, she changed her testimony and claimed to be reminded that this was when her "husband and the company put down the wall." (Tr. at 61.)

Defendants also introduced in evidence some liquor invoices issued to After 8 dated April 8, 9, 14, 15, 23 and May 1, 15, 27, totaling approximately $8,000-$9,000. (*See* Tr. at 125; Trial Ex. D-c.) Elakhras testified that these reflect purchases to stock the bar for the first time. (*See* Tr. at 125-26.) Elakhras explained that he waited a few months after After 8 received the Place of Assembly Certificate before stocking and opening the bar because he needed to replenish his cash reserves after the construction expenses. (*See* Tr. at 126.) Elakhras also testified that there would have been

5

no need to hire Plaintiff as a bartender prior to late May 2015 because the bar was not stocked with liquor until then. (*See* Tr. at 126.)

Defendants contend that Plaintiff did receive "house pay." Elakhras testified that when he hired Plaintiff, he told her she would receive $6.75 per hour in "house pay" as well as a share of the tips received by the waiters. (*See* Tr. at 127-28.) He arrived at that hourly rate after speaking to another bar owner in New York City, who said that $6.75 per hour is a fair wage for a bartender who also receives tips. (*See* Tr. at 127.) However, Plaintiff "was never given any documents showing how much her pay was going to be." (*See* Tr. at 154.) Elakhras paid Plaintiff in cash for both her Friday night and Saturday night shifts at the end of her Saturday night shift (*i.e.*, early Sunday morning). (*See* Tr. at 127.)

Defendants did not keep records of Plaintiff's pay, although they claim that they did have records for all other After 8 employees who were paid in cash. Elakhras testified that there was no record at all that he ever paid her any house pay. (*See* Tr. at 139.) He also testified that he did not make Plaintiff sign for each payment because "she never give [sic] her ID" and "[s]he gave no information." (Tr. at 139.) He testified at trial that he did ask Plaintiff to sign a receipt when paying her and she refused, but his deposition testimony was that he never asked her to sign any receipt for the cash. (*See* Tr. at 143-44.)

Lazhir testified that Elakhras "made a big mistake for not letting [Plaintiff] sign, and that's why he is paying the price now." (Tr. at 90.) She could not explain why Elakhras did not insist that Plaintiff sign her name for each payment (Tr. at 90), and conceded that there was no existing document showing that Plaintiff was ever paid any house pay from After 8. (*See* Tr. at 93.)

Defendants contended that Plaintiff worked no more than 8 hours per week for the duration of her employment: two 4-hour shifts on Friday and Saturday night, from 12:00 midnight to 4:00 a.m., exclusively as a bartender. (*See* Tr. at 64, 126-27.) Elakhras testified that Plaintiff was given a

6

one-hour break, which she would take from 2:00 a.m. to 3:00 a.m. (*See* Tr. at 130.) Weekly employee work schedules that Defendants introduced in evidence covering May 5, 2014 through May 18, 2015 indicate the shifts of three to four After 8 employees working on Friday and Saturday nights from 5:00 p.m. to 1:00 a.m. (*See* Tr. at 149; Trial Ex. D-d.) Plaintiff's name does not appear on these schedules, but neither does the name of "Jorge," who, according to Lazhir, worked at After 8 prior to its renovation. (Tr. at 59; Trial Ex. D-d.) Elakhras suggested that those schedules only presented partial information because there are "two schedules" or "two shifts." (Tr. at 149-50.) However, no work schedules were produced for those second shifts.

Lazhir testified that before the large construction project was completed in May 2015, After 8 would close at around 3:00 a.m. on Friday and Saturdays nights. (*See* Tr. at 69.) She kept track of employee start times, although she was inconsistent in describing what she did: according to her deposition testimony, she made a note of the time Plaintiff arrived (*see* Tr. at 97), but at trial, she testified that she only put a check-mark on the schedule to indicate that an employee had shown up for his or her shift, without noting the time. (*See* Tr. at 98.) Lazhir alluded to the existence of other schedule and attendance records, as well as signed pay receipts by other employees, but none were presented at trial. (*See* Tr. at 98-100.) Lazhir acknowledged that she was typically not present when After 8 closed, so she could not keep track of when Plaintiff ended each shift. (*See* Tr. at 93-94.)

Employee work schedules covering the weeks of May 25, 2015 through November 2, 2015, show eight employees including Plaintiff, who was known as "Katrina." (*See* Trial Ex. D-d.) The entries for "Katrina" show "12 AM-4 AM" in the boxes for Friday and Saturday, with a check mark next to those times, and "off" for all the other days. (*See* Trial Ex. D-d.) The names and schedules of all other employees are redacted.

7

### E. *The Court's Findings of Fact*

*Plaintiff's Start Date*

The Court accepts Plaintiff's version of facts with regard to when she began work. Plaintiff clearly remembered that her first day of work was on June 6, 2014. Even without the purported cellphone "Note" and the photographs, her testimony is credible. By contrast, Defendants' attempt to push Plaintiff's start date back by a year is contradicted by their own exhibits and conflicting testimony.

Defendants claim that demolition of the wall to combine After 8 with the space next door occurred in April 2015, yet the only work permits they produced had already expired in August 2014 and January 2015. Those DOB work permits allowed general construction and plumbing work to begin in January 2014, which is consistent with Plaintiff's testimony that after she began working at After 8 on June 6, 2014, the spaces were already combined, and she never saw construction. Furthermore, the Certificate of Occupancy issued in January 2015 already indicated that After 8 could accommodate 188 people, a number more consistent with a larger space than the small café described by Defendants. There was no proof that after April 2015, the maximum occupancy for After 8 increased to account for the doubled space. In fact, Lazhir herself believed that the wall had come down in January 2015, and only changed her testimony to the later date when it turned out to be inconsistent with the handwritten notation on Defendants' Trial Exhibit D-d.

The 2015 liquor invoices dated April 8, 9, 14, 15, 23 and May 1, 15, 27 are also unavailing, as they do not necessarily support an initial stocking of the bar, rather than an ordinary re-stocking. For example, several of the invoices include a specific item that was ordered in a similar quantity on at least one prior invoice, consistent with a pattern of re-stocking. (*See, e.g.,* April 8 and May 27 Invoices, April 14 and 23 Invoices, Trial Ex. D-c.) In fact, the liquor license entered by Plaintiff in evidence has a filing date of November 16, 2011 and effective date of December 1, 2015. (Trial Ex.

8

P-6.) No other liquor licenses were entered in evidence. Elakhras himself testified that selling drinks is the most profitable part of the business, so it is reasonable to conclude that After 8 would begin serving drinks as soon as possible after obtaining a liquor license. (Tr. at 145.) Without further evidence, the Court does not accept that the bar only began operating in April-May 2015.

Finally, the fact that Plaintiff's name is not on the employee schedules which Defendants produced for the period May 5, 2014 through May 18, 2015 is not dispositive, as Elakhras admitted that these were incomplete records, and there was a second schedule which was not produced.

Accordingly, the Court finds that Plaintiff's employment at After 8 began on June 6, 2014 and ended on November 8, 2015—a period of 74 weeks and 2 days.

*Plaintiff's Work Hours*

With regard to the number of hours Plaintiff worked, the Court credits Plaintiff's testimony.

Defendants claim that Plaintiff worked no more than two four-hour shifts each week, on Friday and Saturday nights, but they failed to keep accurate records. For the period May 5, 2014 through May 18, 2015, Defendants produced incomplete work schedules, which did not include employee work times beyond 1:00 a.m., even though Elakhras and Lazhir both testified that After 8 was open until either 3:00 or 4:00 a.m. There were no records for Plaintiff during this time. The records they produced for the period May 25, 2015 through November 2, 2015 include schedules for Plaintiff's purported shifts, but Plaintiff never signed in or out, and Lazhir admitted that she did not record the time when employees actually arrived or left. Furthermore, other employees' names and schedules were redacted on these records. These deficiencies limit the reliability of Defendants' recordkeeping and cast doubt on Defendants' contention that Plaintiff worked only Fridays and Saturdays from midnight until 4:00 a.m. Finally, Elakhras testified that Plaintiff was given, and usually would take, a one-hour break during each shift. The Court does not find it credible that Plaintiff would receive such a break if the shift were only four hours long.

9

While the parties did not provide conclusive evidence of the exact date of Plaintiff's first Tuesday shift in January 2015, Plaintiff's counsel suggested on summation that Tuesday, January 13, 2015 is the "truthful date" that After 8 began to host live music because that is when the Certificate of Occupancy issued. (*See* Tr. at 167.) Defendants presented no evidence of when they received a cabaret license. Plaintiff testified that she began working a Tuesday shift after live music began, so the Court takes the following Tuesday, January 20, 2015, as the date of Plaintiff's first additional shift.[3] (Tr. at 31-32.)

Given that Defendants could not credibly refute Plaintiff's testimony, the Court therefore resolves credibility in Plaintiff's favor on this issue, and finds that Plaintiff worked the following hours: from June 6, 2014 until January 18, 2015, Plaintiff worked Fridays and Saturdays from 4:00 p.m. to 4:00 a.m., with a one-hour break (22 hours per week) and Mondays from 4:00 p.m. to 2:00 a.m., with a one-hour break (9 hours per week), for a total of 31 hours per week; and from January 19, 2015 until November 8, 2015, Plaintiff worked Fridays and Saturdays from 4:00 p.m. to 4:00 a.m., with a one-hour break (22 hours per week) and Mondays and Tuesdays from 4:00 p.m. to 2:00 a.m., with a one-hour break (18 hours per week) for a total of 40 hours per week. Plaintiff has not proven that she worked more than 40 hours per week during any period of her employment, taking into consideration breaks that she took. There was no evidence introduced that Plaintiff's breaks were *meal* breaks for the purpose of determining whether Plaintiff was working a "split shift" under the NYLL.

*Plaintiff's Rate of Pay*

Defendants admit that there are no records of Plaintiff receiving any house pay. Elakhras gave conflicting testimony about whether he asked Plaintiff to sign a receipt for her alleged wages

---

[3] The Court notes that the Certificate of Occupancy states "Not a cabaret," but this official designation, absent other evidence, does not preclude a factual finding that live music began on that date.

10

and she refused, or whether he never asked her to sign at all. Furthermore, he could not give an explanation for why he would have required all other employees to sign for their wages, but not Plaintiff. Finally, Elakhras claimed to have paid Plaintiff wages covering four hours of work a night, but according to his own testimony, she took an hour break each night, which would have entitled her to only three hours of wages. Given the lack of documentary evidence and the contradictions in Defendant Elakhras's testimony, the Court finds that Plaintiff did not receive house pay and was remunerated only in tips.

The Court further finds that Defendants did not provide Plaintiff with the required annual wage notices.

## II. Conclusions of Law

### A. *Minimum Wage Laws*

Under the FLSA, the applicable minimum hourly wage rate was $7.25. *See* 29 U.S.C. § 206(a)(1)(C). Under the NYLL, the applicable minimum hourly wage rates for the time periods at issue were: (1) $8.00 an hour for the period June 6, 2014 until December 30, 2014; and (2) $8.75 from December 31, 2014 until November 8, 2015. N.Y. Lab. L. § 652(1). Both statutes specify that, where the other statute prescribes a higher minimum wage, the higher wage shall control. *See* 29 U.S.C. § 218(a); N.Y. Lab. L. § 652(1). In this case, the wage rates provided by the NYLL were higher throughout Plaintiff's employment. Thus, the Court applies the applicable minimum wage rates prescribed under the NYLL for the relevant times that Plaintiff worked for Defendants.

The Court concludes that Defendants are liable to Plaintiff for violation of the FLSA and NYLL minimum wage laws during the entire period of Plaintiff's employment for Defendants: June 6, 2014 through November 8, 2015.

For the period June 6, 2014 through December 30, 2014, Plaintiff was employed by Defendants for just under 30 weeks, and worked 31 hours per week. Accordingly, at the NYLL

11

minimum wage of $8.00 per hour that applied during that period, Defendants are liable to Plaintiff for $7,440.00 in unpaid minimum wages.

For the period December 31, 2014 through January 18, 2015, Plaintiff was employed by Defendants for just under 3 weeks, and worked 31 hours per week. Accordingly, at the NYLL minimum wage of $8.75 per hour that applied during that period, Defendants are liable to Plaintiff for $813.75 in unpaid minimum wages.

For the period January 19, 2015 through November 8, 2015, Plaintiff was employed by Defendants for just under 42 weeks, and worked 40 hours per week. Accordingly, at the NYLL minimum wage of $8.75 per hour that applied during that period, Defendants are liable to Plaintiff for $14,700.00 in unpaid minimum wages.

In total, for the period June 6, 2014 through November 8, 2015, Defendants are liable to Plaintiff for **$22,953.75 in unpaid minimum wages under the FLSA and NYLL**.

B. *Overtime Laws*

Under both the FLSA and NYLL, an employee is entitled to overtime pay, calculated at one and one-half times the employee's regular rate, for hours worked in excess of 40 hours in one work week. *See* 29 U.S.C. § 207(a)(2)(C); 12 N.Y.C.R.R. § 142-2.2. Because the Court has not found that Plaintiff worked more than 40 hours per week for Defendants, Defendants are not liable to Plaintiff for violation of the overtime laws.

C. *Spread of Hours Laws*

"Under the NYLL, an employee is entitled to earn an additional hour of pay at the minimum wage for each day on which that employee works more than ten hours." *Saucedo v. On the Spot Audio Corp.*, No. 16-CV-451(CBA) (CLP), 2016 WL 8376837, at *12 (E.D.N.Y. Dec. 21, 2016) (citing 12 N.Y.C.R.R. § 146-1.6(a)), *R&R adopted*, 2017 WL 780799 (E.D.N.Y. Feb. 28, 2017). Further, under the NYLL, "[a] split shift is a schedule of daily hours in which the working hours required or

12

permitted are not consecutive" but "[n]o meal period of one hour or less shall be considered an interruption of consecutive hours." *See* 12 N.Y.C.R.R. § 142-2.17.

The Court concludes that Defendants are liable to Plaintiff for violation of the spread-of-hours requirements under the NYLL and 12 N.Y.C.R.R. § 146-1.6(d).

For the period June 6, 2014 through December 30, 2014, Plaintiff was employed by Defendants for just under 30 weeks, and was entitled to spread-of-hours pay for each Friday and Saturday worked during those weeks. Plaintiff is not entitled to spread of hours pay for each Monday worked during those weeks, because the Court has not found that Plaintiff's spread of hours on Mondays *exceeded* 10 hours, even when Plaintiff's breaks are not excluded in the spread of hours calculation. Accordingly, at the NYLL minimum wage of $8.00 per hour that applied during that period, Defendants are liable to Plaintiff for $480.00 in unpaid spread of hours wages.

For the period December 31, 2014 through November 8, 2015, Plaintiff was employed by Defendants for just under 45 weeks, and was entitled to spread-of-hours pay for each Friday and Saturday worked during those weeks. Plaintiff is not entitled to spread of hours pay for each Monday and Tuesday worked during those weeks, because the Court has not found that Plaintiff's workday on Mondays and Tuesdays *exceeded* 10 hours. Accordingly, at the NYLL minimum wage of $8.75 per hour that applied during that period, Defendants are liable to Plaintiff for $787.50 in unpaid spread of hours wages.

In total, for the period June 6, 2014 through November 8, 2015, Defendants are liable to Plaintiff for **$1,267.50 in unpaid spread of hours wages under the NYLL and 12 N.Y.C.R.R. § 146-1.6(d)**.

D. *Liquidated Damages*

Under the FLSA, an employer who fails to pay his or her employees the minimum wage or overtime compensation required by Sections 206 and 207 is "liable to the employee . . . affected in

13

the amount of [his or her] unpaid minimum wages, or [his or her] unpaid overtime compensation . . . and in an additional equal amount as liquidated damages," 29 U.S.C. § 216(b), unless the employer can show that "he acted in good faith and had reasonable grounds for believing that his act or omission was not a violation of the FLSA." *Jemine v. Dennis*, 901 F. Supp. 2d 365, 388 (E.D.N.Y. 2012) (citing 29 U.S.C. §§ 216(b), 260). This additional award provides "compensation to the employee occasioned by the delay in receiving wages caused by the employer's violation of the FLSA." *Id.* (quoting *Herman v. RSR Secs. Servs., Ltd.*, 172 F. 3d 132, 141-42 (2d Cir. 1999)). The analysis of liquidated damages is similar under the NYLL. *See* N.Y. Lab. L. §§ 198(1-a), 663(1); *Xochimitl v. Pita Grill of Hell's Kitchen, Inc.*, No. 14-CV-10234 (JGK) (JLC), 2016 WL 4704917, at *15 (S.D.N.Y. Sept. 8, 2016) ( "As of November 24, 2009, an employee was entitled to NYLL liquidated damages 'unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law'") (citing N.Y. Lab. Law § 198(1-a)).

The Second Circuit has interpreted the NYLL to preclude the award of double liquidated damages under both the NYLL and FLSA. *See Chowdhury v. Hamza Express Food Corp.*, 666 Fed. Appx. 59, 61 (2d Cir. 2016) (summary disposition); *see also Leon v. Zita Chen*, No. 16-CV-480 (KAM) (PK), 2017 WL 1184149, at *9 (E.D.N.Y. Mar. 29, 2017) (following *Chowdhury*). In light of the principle that "the law providing the greatest recovery will govern," Plaintiff may be awarded liquidated damages pursuant to the NYLL. *See Charvac v. M & T Project Managers of New York, Inc.*, No. 12-CV-5637 (CBA) (RER), 2015 WL 5475531, at *4 (E.D.N.Y. June 17, 2015) (citing *Wicaksono v. XYZ 48 Corp.*, No. 10–CV–3635 (LAK) (JCF), 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011), *R&R adopted*, 2011 WL 2038973 (S.D.N.Y. May 24, 2011)). The NYLL provides the greater recovery for Plaintiff because it allows Plaintiff to recover liquidated damages for all claims brought under the NYLL, including the spread of hours wages owed, while the FLSA only provides liquidated damages for claims brought under the FLSA—in this case, only the claims for unpaid

14

minimum wage.

Following *Chowdhury* and subsequent decisions of courts in this Circuit, the Court awards Plaintiff liquidated damages on her NYLL minimum wage and spread of hours claims, and declines to award Plaintiff additional liquidated damages on her FLSA minimum wage claims. The Court thus awards Plaintiff liquidated damages of **$22,953.75** on Plaintiff's NYLL minimum wage claims, and awards Plaintiff liquidated damages of **$1,267.50** on Plaintiff's NYLL spread of hours claims.

Accordingly, the Court awards Plaintiff **total liquidated damages of $24,221.25**.

E. *Annual Wage Notice and Record-Keeping Requirements*

Section 195(1)(a) of the NYLL requires employers to provide employees at the time of hiring with a notice containing, *inter alia*, the rate of pay, the basis thereof, and any tip allowance. Section 195(3) requires employers to provide employees with "a statement with every payment of wages," listing various information including the dates of work covered by the payment, information identifying the employer and employee, details regarding the rate of pay and the overtime rate of pay, and the number of hours worked. Violations of Section 195(1) and 195(3) carry damages of $50.00 and $250.00 per work day, respectively, and maximum statutory damages of $5,000 together with costs and reasonable attorney's fees. N.Y. Lab. L. §§ 198(1-b), 198(1-d); *see Saucedo*, 2016 WL 8376837, at *13.

The Court awards Plaintiff the **maximum statutory damages of $5,000.00** based on Defendants' failure to comply with the annual wage notice requirements of the NYLL.

F. *Interest, Attorney's Fees, and Costs*

Plaintiff did not seek pre-judgment interest in her Complaint or pre-trial damages calculation. (*See* Dkt. 1; 20-1.) Thus, the Court does not award pre-judgment interest. *See Li v. Leung*, No. 15-CV-5262 (CBA) (VMS), 2016 WL 5369489, at *20, n.12 (E.D.N.Y. June 10, 2016) (declining to award pre-judgment interest where not requested by Plaintiff), *R&R adopted as modified*,

15

2016 WL 5349770 (E.D.N.Y. Sept. 23, 2016); *Melgadejo v. S&D Fruits & Vegetables, Inc.*, No. 12-CV-6852 (RA) (HBP), 2015 WL 10353140, n.1 (S.D.N.Y. Oct. 23, 2015) (finding pre-judgment interest and other damages abandoned where Plaintiff failed to include them in damages submission), *R&R adopted*, 2016 WL 554843 (S.D.N.Y. Feb. 9, 2016).  However, Plaintiff is entitled to post-judgment interest under 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." *See Li*, 2016 WL 5369489, at *20 (awarding post-judgment interest and discussing mandatory effect of statutory language); *Xochimitl*, 2016 WL 4704917, at *19 (same).  Plaintiff did seek attorney's fees and costs in her Complaint and pre-trial submissions.  (*See* Dkt. 1 at 12; 18 at 3.)

      The Court awards Plaintiff **post-judgment interest** at the rate given in 28 U.S.C. § 1961, to be calculated from the date of judgment to the date of payment, and grants Plaintiff leave to submit, no later than fourteen (14) days after the date of this Order, supporting documentation with regard to attorney's fees and costs.  *See Saucedo*, 2016 WL 8376837, at *17-21 (reviewing documentation corroborating application for attorney's fees and costs); *Xochimitl*, 2016 WL 4704917, at *19-22 (same).

## **CONCLUSION**

Based on the findings of fact and the conclusions of law set forth above, the Court holds Defendants jointly and severally liable to Plaintiff for the total sum of **$53,442.50 plus post-judgment interest**, comprised of:

(i) **$22,953.75** in unpaid minimum wages, together with liquidated damages of **$22,953.75** on the NYLL minimum wage claims;

(ii) **$1,267.50** in unpaid spread-of-hours wages, together with liquidated damages of **$1,267.50** on the NYLL spread-of-hours claims;

(iii) **$5,000.00** in statutory damages on the NYLL wage notice requirements; and

(iv) **Post-judgment interest** as provided in 28 U.S.C. § 1961, to run from the date of judgment until the judgment is satisfied.

The Court also grants Plaintiff leave to submit an application for reasonable attorney's fees and costs within fourteen (14) days of the date of this Order.

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:   Brooklyn, New York
         May 23, 2017

17